UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No. 14-20926-CR-MOORE/MCALILEY

UNITED STATES OF AMERICA,

      Plaintiff,

v.

RONEN NAHMANI

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant Ronan Nahmani's Motion to Exclude Government's Expert pursuant to Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [DE 51]. Nahmani argues that the opinion of the government's expert pharmacologist, Dr. Jordan Trecki, is not reliable and should not be admitted at trial. This motion was referred to me by the Honorable K. Michael Moore, it is fully briefed and I held an evidentiary hearing on May 18, 2015. [DE 11, 63, 69, 73, 75]. For the reasons set forth below, I recommend that the motion be denied.

**I.     Background**

Defendant, Ronen Nahmani, is charged by Indictment with, *inter alia*, conspiracy to possess with intent to distribute controlled substance analogues, as defined in 21 U.S.C. § 802(32)(A), knowing that the substances were intended for human consumption, in violation of 21 U.S.C. §§ 813, 841(a)(1) and 846. [DE 3]. The alleged controlled

1

substance analogues are THJ-2201, 5-Chloro-UR-144, and 5-Bromo-UR-144.  [*Id.* at p.

2].

Title 21, Section 802(32) (A) defines a controlled substance analogue as a

substance:

> (i) the chemical structure of which is substantially similar to the chemical
> structure of a controlled substance in schedule I or II;
>
> (ii) which has a stimulant, depressant, or hallucinogenic effect on the
> central nervous system that is substantially similar to or greater than the
> stimulant, depressant, or hallucinogenic effect on the central nervous
> system of a controlled substance in schedule I or II; or
>
> (iii) with respect to a particular person, which such person represents or
> intends to have a stimulant, depressant, or hallucinogenic effect on the
> central nervous system that is substantially similar to or greater than the
> stimulant, depressant, or hallucinogenic effect on the central nervous
> system of a controlled substance in schedule I or II.

The government intends to offer Dr. Trecki's testimony as proof of the second

element of Section 802(32) (A), that is that THJ-2201, 5-Chloro-UR-144, and 5-Bromo-

UR-144 have a hallucinogenic effect[1] on the central nervous system that is substantially

similar to or greater than the hallucinogenic effect on the central nervous system of a

controlled substance on schedule I of the Controlled Substances Act (CSA).

Specifically, in his expert report, Dr. Trecki opines that TJH-220 "has a

hallucinogenic effect on the central nervous system that is substantially similar to the

hallucinogenic effect on the central nervous system of AM2201 . . . a CSA schedule I

cannabinoid substance."  [DE 51-3, p.1].  Regarding 5-Chloro-UR-144, and 5-Bromo-

UR-144, Dr. Trecki opines that they are "*likely* to have a hallucinogenic effect on the

---

[1] Dr. Trecki testified that his opinion is limited to the hallucinogenic effect of the alleged
analogues; he offered no opinion as to their stimulant or depressant effect.  [DE 75, p. 5].

central nervous system that is substantially similar to the hallucinogenic effects on the central nervous system of 5F-UR-144 . . . . a CSA schedule I cannabinoid substance." [DE 51-1, p. 1, 51-2, p. 1] (emphasis added).

At the *Daubert* hearing, Dr. Trecki outlined the methodology that he used to reach his opinions. As a general practice, Dr. Trecki begins his analysis of the pharmacological effects of a suspected controlled substance analogue by searching for studies on the substance. [DE 73, pp. 15-6]. The three types of studies or reports he typically relies on are: (1) *in vitro*, or laboratory, studies testing binding affinity and functional affinity of the substance; (2) *in vivo*, or animal drug discrimination studies testing the effect of the suspected analogue on animals; and (3) law enforcement, emergency room or coroner case reports regarding the experiences of persons who have used the alleged analogue. [*Id.* at pp. 17-8, 24-5].

Many of the studies Dr. Trecki relies on have been conducted under the auspices of the National Institute on Drug Abuse (NIDA). NIDA funds studies by academic institutions that often are not published in peer review journals, and may not be publically available. Dr. Trecki testified, however, that NIDA researchers review these studies to ensure that they use accepted research methodologies and for this reason they are considered reliable. [*Id.* at pp. 16-7, 37-9].

In analyzing a suspected analogue, Dr. Trecki also evaluates the structural activity relationship (SAR) between the alleged analogue controlled substance, and the known Schedule 1 controlled substance he uses for comparison. The SAR analysis examines the structure of the two substances and, based on a comparison of their core structures and

functional groups, predicts the effect of the alleged analogue on the central nervous system. [*Id.* at pp. 28-30].[2]

Dr. Trecki testified that he relied on *in vivo, in vitro*, and case reports, as well as an SAR analysis, in reaching his opinion regarding THJ-2201. [DE 73, p. 25]. However, for 5-Chloro-UR-144 and 5-Bromo-UR 144, Dr. Trecki only used the SAR analysis to reach his opinion as it currently is the only available resource. [*Id.*]. Dr. Trecki explained that these two substances have recently appeared in commerce, and thus there were no clinical test results available at the time he rendered his opinion.[3]

Nahmani's expert, clinical pharmacologist Daniel Buffington, testified that Dr. Trecki's methodology does not provide enough information to support a reliable opinion that the alleged analogues have a substantially similar hallucinogenic effect on the central nervous system as does a schedule I controlled substance. [DE 75, p. 33-36].

I address each of Dr. Trecki's opinions below and reference specific testimony from the *Daubert* hearing when relevant.

---

[2] A "functional group" is a group of atoms and associated bonds that "confer special reactivity patterns of the molecules of which they are a part." Encyclopaedia Britannica, Chemical Compound Functional Groups, www.britannica.com/science/chemical-compound/Functional-groups.

[3] Well after the conclusion of the Daubert hearing, the government filed a Notice of Supplemental Scientific Authority as to Daubert Motion Regarding Dr. Trecki. [DE 96]. In fact, this "Notice" included two amended Summary of Expert Opinion reports by Dr. Trecki regarding 5-Cl-UR-144 and 5-Br-UR-144, incorporating reports of new *in vitro* data dated May, 2015. *See* DE 96-1, p. 3, #9; 96-2, p. 3, #9. I do not address this new information here because Dr. Trecki did not offer any testimony at the hearing regarding this source of information, nor did Nahmani have the opportunity to cross-examine Dr. Trecki about this, or have his own expert address this data.

## II.   Analysis

Federal Rule of Civil Procedure 702 governs the admissibility of expert opinion testimony. The Rule requires this Court to act as a gatekeeper, admitting only scientific, technical or other specialized expert testimony that is both reliable and relevant. *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). This gatekeeping task is particularly challenging when the dispute, as in this case, "concerns matters at the very cutting edge of scientific research, where fact meets theory and certainty dissolves into probability." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1321 (11th Cir. 1999) (quotation and citation omitted).

For expert testimony to be admissible under Rule 702, the proponent of the testimony must show that:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563 (11th Cir. 1998)).

In other words, here, the government must show that Dr. Trecki is qualified, that his opinion is reliable and that it is relevant. Nahmani does not challenge Dr. Trecki's qualifications or the relevance of his proffered testimony. [DE 73, p. 5]. Rather, Nahmani argues that the methodology Dr. Trecki used to reach his opinion for each substance is unreliable. [*Id.* at p. 4].

5

In evaluating the reliability of an expert opinion, *Daubert* directs this Court to focus on the methodology behind the opinion rather than the accuracy of the opinion. However, when the expert's opinion clearly demonstrates something about his methodology, it is appropriate for the court to draw inferences about the methodology from the opinions. *McClain v. Metabolife International, Inc.*, 401 F.3d 1233, 1243 n.8 (11th Cir. 2005).

The *Daubert* inquiry must be a flexible one and is not subject to a definitive list of factors. *Maiz*, 253 F.3d at 665. In their review of the reliability of an expert's opinion, courts generally consider whether the expert's methodology can and has been tested, whether it has been subject to peer review and publication, the known error rates or standards for the methodology, and whether the methodology is generally accepted in the field. *United States v. Brown*, 415 F.3d 1257, 1267 (11th Cir. 2005).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." *Allison*, 184 F.3d at 1306. The trial Court enjoys "considerable leeway" in making this decision. *United States v. Frazier*, 387 F.3d 1244, 1258-59 (11th Cir. 2004) (quoting *Kumho Tire*, 526 U.S. at 152); *Brown*, 415 F.3d at 1264-5 (district court has a "significant range of choice" on evidentiary issues, including the admission of expert testimony).

Regardless of this Court's broad discretion, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Com. Note. The Court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury.

Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking debatable but admissible evidence." *Maiz*, 253 F.3d at 666 (quotation marks and citations omitted).

### A.   THJ-2201

Dr. Trecki's opinion regarding THJ-2201 is that it has a hallucinogenic effect on the central nervous system that is substantially similar to the hallucinogenic effect on the central nervous system of the schedule I controlled substance AM2201.   Dr. Trecki reached this opinion after reviewing *in vivo* and *in vitro* studies and case reports on THJ-2201; he also conducted a SAR analysis comparing THJ-2201 to AM2201.   The *in vitro* studies were binding assays and functional assays, which showed that in a petri dish, THJ-2201 binds to and activates CB1 receptors. [4]   CB1 receptors, or cannabinoid receptors, are the same receptors in the central nervous system that are activated by THC, the active ingredient in marijuana. [5]   [DE 73, p. 14].   Dr. Trecki testified that activation of these receptors will result in euphoria, a hallucinogenic effect. [6]   [*Id.*].

The *in vivo* study Dr. Trecki relied on is a drug discrimination study in which rats trained to prefer THC were unable to distinguish between THC and THJ-2201.   [DE 73,

---

[4] An assay is a qualitative or quantitative analysis of a substance.   THE AMERICAN HERITAGE DICTIONARY, 2nd College Ed., 1983.

[5] THC, which is found in marijuana, is a "classic example" of a cannabinoid listed on Schedule 1.   [DE 73, p. 14].   According to Dr. Trecki, it is common for studies of alleged cannabinoid analogues, such as the substances at issue here, to use THC as a controlled substance.   [*Id.* at pp. 14, 61-2].

[6] Dr. Trecki initially described the effect of THJ-2201 as producing "euphoria."   He later clarified that he used this term interchangeably with "hallucinogenic effect."   [DE 73, pp. 57, 70].

pp. 23, 61-2]. Relying on this study, and studies explaining the process for using the results of animal drug discrimination studies to extrapolate the effect of a substance on humans, Dr. Trecki concluded that the effect of THC and THJ-2201 on the rats was indistinguishable. [*Id.* at pp. 62-3]. Dr. Trecki also considered coroner's reports regarding deaths linked to THJ-2201. [*Id.* at p. 43].

Nahmani raises three objections to the studies relied upon by Dr. Trecki: first, they are unpublished, second, the NIDA studies have not been peer reviewed and third, the *in vivo* animal studies are too speculative. [DE 73, p. 6-7]. For these reasons, Nahmani argues that Dr. Trecki's methodology is not sufficiently reliable to allow him to reach an opinion that the hallucinogenic effect of THJ-2201 is substantially similar to or greater than a Schedule 1 controlled substance.

In support of Nahmani's arguments, Dr. Buffington testified that the studies Dr. Trecki considered to reach his opinion do not provide enough information for an expert to reliably opine on the hallucinogenic effect of an alleged analogue. [DE 75, pp. 31-2, 34-5]. Dr. Buffington stated that these pre-clinical studies are inadequate to support Dr. Trecki's opinion and that only human trials would provide sufficiently reliable information to determine the effect of the alleged analogues on the central nervous system. [*Id.* at p. 36].

Recently another court that had before it a criminal prosecution involving an alleged controlled substance analogue, considered the admissibility of Dr. Trecki's expert opinion regarding that analogue under the second prong of section 802(32)(A), and found that his methodology satisfied the requirements of *Daubert*. *See United States v. Bays*,

No. 3:13-CR-0357-B, 2014 WL 3764876 (N.D. Tex. July 31, 2014).  Like here, in *Bays*, Dr. Trecki reached his opinion relying in part upon non-peer reviewed and unpublished NIDA *in vivo* and *in vitro* studies and the court found Dr. Trecki's opinion sufficiently reliable.

In reaching that conclusion, the *Bays* court first addressed the argument that Dr. Trecki's reliance on non-peer reviewed and unpublished studies, particularly NIDA studies, undermined the reliability of his opinion.  The court found that the NIDA studies employed well known methodologies that could be evaluated by defense experts.  2014 WL 3764876, at *12.  The court noted that other courts have permitted expert opinions based, in part, on NIDA research in controlled substance analogue cases. *Id.* at * 14.  The *Bays* Court concluded that given the "quickly evolving and fluid nature or drug analogue cases," for practical reasons, experts could properly rely on unpublished NIDA research. *Id.* at *12.

The *Bays* court also rejected the defense challenge to Dr. Trecki's reliance on *in vivo* and *in vitro* studies.  The defendant in *Bays* argued that studies on animals could not reliably show the pharmacological effect of the alleged analogues on humans, and noted that other courts have found animals studies insufficient to establish causation in humans in toxic tort cases.  *Id.* at *13.  The government countered that the assessment of a controlled substance analogue is an entirely different scientific question than the causation issue addressed in the prescription drug approval process or the toxic tort context, and therefore these cases were inapposite.  *Id.*  In the end, the *Bays* court was not persuaded that reliance on *in* vivo and *in* vitro studies was invalid as a matter of law, and

9

found that "the research and study of controlled substance analogues is unique" and opinions based in part on animals studies were sufficiently reliable to satisfy *Daubert*. 2014 WL 3764876, at *14.

I am persuaded that Dr. Trecki's reliance on unpublished or NIDA-sponsored studies of *in vivo* and *in vitro* experiments does not render his opinion so unreliable that it cannot be presented to a jury. Nahmani's challenges certainly suggest that Dr. Trecki's opinion is debatable, but they more properly address the weight to be given to that opinion by the jury, rather than its admissibility. As this Circuit noted in *Brown*, "[q]uestions about the weight given to testimony, as distinguished from this issue of its admissibility, are for the factfinder. 415 F.3d at 1270.

### B.    5-Chloro-UR-144, and 5-Bromo-UR-144

Unlike Dr. Trecki's opinion regarding THJ-2201, which relied on multiple sources of information, his opinion about 5-Chloro-UR-144, and 5-Bromo-UR-144 is based only on SAR analysis. Dr. Trecki testified that *in vivo* and *in vitro* studies and case reports were not available for these substances when he prepared his report. [DE 73, p. 25]. Because of this limited information, Dr. Trecki qualified his opinion: he states that these substances are "*likely*" to have a substantially similar effect on the central nervous system as does a schedule I controlled substance. [DE 51-1, p. 1, 51-2, p. 1]. Nahmani argues that the government has not shown that SAR, standing alone, is a sufficiently reliable method upon which to reach this opinion.

Dr. Trecki explained at the hearing how he undertook a predictive analysis using SAR on these two alleged analogues. Specifically, Dr. Trecki compared the structure of

a schedule I controlled substance, XLR11 (also known as 5F-UR-144), to the structures of the two alleged analogues, 5-Chloro-UR-144 and 5-Bromo-UR-144. As shown in government exhibit 2, which is attached to this report and recommendation, the three substances have an identical core structure and differ only in their terminal molecules, which are florine, bromide and chlorine. [DE 73, at pp. 28-33]. Dr. Trecki testified that there is an abundance of available data about a variety of substantially similar synthetic cannabinoids, including 5-Fluoro-UR-144, that differ only in the terminal molecule. Further, there is considerable data about the similarities between fluorine, bromide and the chlorine, the three terminal molecules at issue in his SAR comparison. [DE 73, pp. 41-2]. He testified that peer-reviewed, published literature supports his conclusion that the difference in the terminal molecules does not alter the pharmacological effect of the compared substances. [*Id.* at p. 76].

Dr. Buffington agreed that SAR analysis is an accepted analytical tool for predicting the pharmacological effect of substances on the central nervous system. However, he considers the SAR analysis only a starting point; he believes it does not provide enough information to reach a conclusion about the effect of the alleged analogues on the central nervous system. [DE 75, pp. 31-3]. Dr. Buffington may well be correct, but his opinion is not enough to cause the Court to preclude Dr. Trecki from offering his.

To be admissible, Dr. Trecki's opinion, standing alone, need not establish that the alleged analogues have a substantially similar or greater effect on the central nervous system than a schedule I controlled substance. In fact, Dr. Trecki frankly qualifies his

11

opinion about 5-Chloro-UR-144 and 5-Bromo-UR-144, offering only that the hallucinogenic effect of these substances is *likely* to be the same or greater than that of the comparison Schedule 1 controlled substance.

The test under Rule 702, however, is not whether the expert's opinion testimony is sufficient to meet the proponent's burden of proof; it is whether the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evd. 702(a).  Dr. Trecki's testimony regarding his SAR analysis and its application in predicting the pharmacological effect of the alleged analogues will assist the jury to determine whether the alleged analogues have a substantially similar or greater hallucinogenic effect on the central nervous system than a schedule I controlled substance.

Because the SAR analysis is a recognized analytical method for predicting the pharmacological effect of a substance, Nahmani's criticism of the SAR analysis goes to the weight of Dr. Trecki's testimony, not its admissibility.  Nahmani will have the opportunity challenge the limitations of Dr. Trecki's opinion on cross-examination and through the testimony of his own expert.

## III.   Recommendation

Based on the foregoing, I respectfully recommend that:

Defendant Ronan Nahmani's Motion to Exclude Government's Expert [DE 51], be DENIED.

## IV.   Objections

The parties may file written objections to this report and recommendation with the Honorable K. Michael Moore **no later than July 2, 2015**.   Failure to timely file objections shall bar the parties from attacking on appeal any factual findings contained herein.  *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988).

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida this 25th day of June, 2015.

CHRIS MCALILEY
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable K. Michael Moore
Counsel of Record

*United States v. Bays, 3:13-CR-00357-B*

AM2201

5F-UR-144
(XLR11)

PB-22

5F-PB-22

*United States v. Nahmani, 1:14-CR-20926-KMM*

5Br-UR-144

5Cl-UR-144

THJ-2201

GOVERNMENT
EXHIBIT
CASE NO. U.S.
Nahmani
EXHIBIT NO.