## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-20926-CR-KMM

**UNITED STATES OF AMERICA,**

**vs**

**RONEN NAHMANI**

_____/

## MEMORANDUM IN AID OF SENTENCING
## AND INCORPORATED OBJECTIONS TO
## <u>PRE SENTENCE INVESTIGATIVE REPORT</u>

Comes now the defendant, RONEN NAHMANI, by and through undersigned counsel and pursuant to Rule 32 of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 3553 and files his Memorandum in Aid of Sentencing and Incorporated Objections to the Pre Sentence Investigative Report (PSIR).

### <u>Objections ot the Pre Sentence Investigative Report</u>

### <u>Related Cases</u>

The defendant objects to the inclusion in paragraph 2 of the PSIR of the District of New Hampshire case, 14-00040-CR-JL, filed against Kyle Hurley and Robert Costello.

The indictment filed in the District of New Hampshire against Kyle Hurley and Robert Costello is not part of the conspiracy alleged in the single count indictment filed in the instant case. Factually, the conduct that was a part of that indictment in the District of New Hampshire ended before the date alleged as the beginning of the conduct in the instant case. It is undisputed that Kyle Hurley and Robert Costello were arrested on March 28, 2014.

Furthermore, nowhere in the statement of facts filed with the Court in support of Hurley's guilty plea in the New Hampshire case is the defendant mentioned as a known or unknown co-conspirator. This 11 page statement of facts lists the explicit details of the separate New

Hampshire conspiracy and its operation.  Finally, Hurley's testimony at trial was that the last time he had received any products from a person he knew as "Ron the milk man" was in late January or early February of 2014.

At best Hurley had a "buyer–seller" relationship with the defendant.  The Eleventh Circuit's position on the "buyer–seller" relationship was set out in *U.S. v. Mercer*, 165 F.3d 1331 (11th Cir. 1999), "While a sale, by definition, requires two parties, the agreement is to exchange drugs for money.  'The buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction.'" *Mercer*, *id* citing to *United States v. Townsend,* 924 F.2d 1385, 1394 (7th Cir.1991).

According to the facts presented by the government during the trial, Hurley was buying and the defendant was selling.  "Where the buyer's purpose is merely to buy and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown."  *United States v. Beasley,* 2 F.3d 1551, 1560 (11th Cir.1993), *cert. denied,* 512 U.S. 1240 (1994), (citing *United States v. Burroughs,* 830 F.2d 1574, 1581 (11th Cir.1987), *cert. denied,* 485 U.S. 969 (1988)).

Based on the foregoing, there are insufficient facts and no legal basis to prove that the defendant was involved in the New Hampshire conspiracy and therefore it should not be listed as a related case.

### **The Offense Conduct**

The defendant objects to the recitation of facts as set forth in paragraphs 3-12, 15, 17, 18, 19, 22, 23, and 26.  The facts contained in these paragraphs appear to be summary narrative conclusions based upon information provided to the probation office by the government and do

2

not accurately reflect the testimony that was actually admitted during the course of the trial. The specific objections are as follows.

In paragraphs 3 and 4, none of the statements attributed to the confidential source were admitted at trial. The confidential source did not testify and any summary of his statements was excluded by the Court as hearsay. These statements should be removed from the PSIR.

The defendant objects to the narrative portion of paragraph 5 that include anything other than the observations of the agents. These statements should be removed from the PSIR.

The defendant objects to the last sentence of paragraph 6 that contains statements attributed to the confidential source. Those statements were not admitted at trial and are not an admission against interest. These statements should be removed from the PSIR.

The defendant objects to the statement in paragraph 7 regarding the number of times that the tracker showed the car going to the area of the storage facility. That testimony was not introduced at trial. These statements should be removed from the PSIR.

The defendant objects to the portions of paragraph 8 that contains statements attributed to the confidential source. The confidential source did not testify at trial and any summary of his statements was excluded by the Court as hearsay. The defendant also objects to the portion of paragraph 8 that infers that the defendant provided anything to the "man in the red shirt." The defendant also objects to the statement that "Agents saw the man filing display bins with small vials from the white boxes that he retrieved from Nahmani." Both Detective Choquette and DEA Special Agent Gittelson testified at trial that they could not see any exchange between the defendant and the person who he met with near the gas station on Davie Road. In addition, Detective Choquette testified during the trial that she never seized any of the glass vials that she observed inside the Sunoco store. These statements should be removed from the PSIR.

The defendant objects to the statement in paragraph 9 that "agents believe he may have been trying to spot or disrupt any possible surveillance." DEA Special Agent Gittelson testified contrary to that conclusion at both a pre-trial motion as well as during the trial. That statement should be removed from the PSIR.

The defendant objects to the last sentence of paragraph 10 that contains statements attributed to the confidential source. Those statements were not admitted at trial, nor were the agents present to observe what was described in the statements. These statements should be removed from the PSIR.

The defendant objects to the first two sentences in paragraph 11 that contain statements attributed to the confidential source. Those statements were not admitted at trial, nor were the agents present to observe what was described in the statements. These statements should be removed from the PSIR.

The defendant objects to the conclusory statements contained in the last two sentences of paragraph 12. There was no testimony introduced at trial that requires the acceptance of those conclusions. They are merely the opinion of the agents. These conclusory statements should be removed from the PSIR.

The defendant objects to the statements contained in paragraph 15 that are attributed to Israel Nahmani. Israel Nahmani did not testify at trial, nor were his statements admitted as an exception to the rule against hearsay. The defendant also objects to the statement that "Some theses vials were identical to ones seized from Nahmani's storage unit." This is speculation on the part of the agents. These statements should be removed from the PSIR.

The defendant objects to the statements contained in paragraph 17. This information was never admitted during the trial. This paragraph should be removed from the PSIR.

The defendant objects to the words "to manufacture" "large quantities" and "at least 40 kilograms" contained in paragraph 18.  There was no evidence introduced at trial that the defendant manufactured synthetic products.  During the trial, the defendant contested both the weight and quantity of the substances found within the storage unit.

The defendant objects to the portions of paragraph 19 that contains statements attributed to the confidential source.  The confidential source did not testify and any summary of his statements was excluded by the Court as hearsay.  This paragraph should be removed from the PSIR.

The defendant objects to the portion of paragraph 22 that sets forth the statements of the defendant.  This summary is an incorrect recitation of the testimony provided by the witness at trial.

The defendant objects to the portion of paragraph 23 that identifies Kyle Hurley as a co-conspirator.  As set forth above, Kyle Hurley was not part of the conspiracy charged in the instant case.  At best Hurley had a "buyer-seller" relationship with the defendant.  The defendant also objects to the use of the term "synthetic cannabinoids."  There was no evidence admitted during the trial identifying the specific substance that Hurley received as a "synthetic cannabinoid."  The defendant also objects to the reference to the facts underlying Hurley's offense of conviction and any estimates or calculations he made regarding his distributions in an unrelated conspiracy.  These statements should be removed from the PSIR.

The defendant objects to paragraph 26.  This paragraph incorrectly attributes to the defendant the weight of the product that Kyle Hurley provided to undercover agents in his unrelated conspiracy.  The defendant also objects to the calculation "chemicals" that he "purchased" from China.  There is insufficient evidence to satisfy the preponderance standard of

proof as to the quantity or identity of any chemicals purchased from Chinese suppliers. Furthermore, any relationship between the defendant and the Chinese suppliers was a buyer-seller relationship and not a part of the conspiracy of conviction.  These estimates should be removed from the PSIR.

**Role Assessment**

The defendant objects to the assessment of a four-level aggravating role adjustment pursuant to USSG § 3B1.1(a) listed in paragraph 27 of the PSIR.  The conspiracy in the instant case was neither extensive nor involved five or more participants.

As set forth above, Kyle Hurley was not part of the conspiracy charged in the instant case.  At best Hurley had a "buyer-seller" relationship with the defendant.  Likewise any customers who received parcels containing unknown substances via commercial delivery services were similarly in a "buyer-seller" relationship with the defendant.  The Chinese supplier was at best a seller and therefore also not part of the conspiracy alleged in the instant indictment.

In addition, there was no evidence or testimony introduced at trial that any "gas station employee" received anything from the defendant.  In fact Detective Choquette and DEA Special Agent Gittelson both testified at trial that they could not see any exchange between the defendant and the person who the defendant met near the gas station on Davie Road.

Finally while related to the defendant, there was no evidence introduced at trial that any of the defendant's brothers were part of the instant conspiracy.

The government has the burden of proving by a preponderance of the evidence the existence of the aggravating role.  *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993). There were insufficient facts introduced at trial for the government to meet their burden of proof under the preponderance standard to assess this enhancement.

Moreover, "The mere status of a middleman or a distributor does not support enhancement under Section 3B1.1 for being a supervisor, manager, or leader.  Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership."  *Yates*, *id*, adopting the reasoning of *United States v. Brown,* 944 F.2d 1377 (7th Cir.1991) and the persuasive interpretation provided by the Commission's commentary in Application Note 3. *See also United States v. De La Rosa*, 922 F.2d 675, 680 (11th Cir. 1991) (The language of Guideline § 3B1.1 requires that the sentencing court focus on the defendant's role in the offense of conviction rather than other criminal conduct in which he may have engaged.)

Therefore, there is no legal or factual basis to assess a four-level aggravating role adjustment pursuant to USSG § 3B1.1(a).

### Calculation of the Base Offense Level

The defendant objects to both the aggregate quantity and the drug equivalency conversion ratio used in paragraph 31 of the PSIR.

### Aggregate quantity

As stated previously, Kyle Hurley was not part of the conspiracy charged in the instant case and at best Hurley had a "buyer-seller" relationship with the defendant.  Additionally, AB-FUBINACA, the primary substance that Hurley purchased, did not become a Schedule I controlled substance, pursuant to the DEA's emergency scheduling authority, until February 10, 2014.  Hurley's testimony at trial was that the last time he had received any products from a person he knew as "Ron the milk man" was in late January or early February of 2014.

As a result if the foregoing, none of the "product" attributable to Hurley was "part of the same course of conduct or common scheme or plan as the offense of conviction."  U.S.S.G. §

1B1.3(a)(2). "Under the sentencing guidelines, a defendant may be held accountable at sentencing for illegal conduct not in furtherance of the offense of conviction if that conduct was "part of the same course of conduct or common scheme or plan" as the offense of conviction. U.S.S.G. § 1B1.3(a)(2)." *United States v. Gomez*, 164 F.3d 1354, 1356 (11th Cir. 1999).

Since none of the "product" attributable to Hurley was illegal or "part of the same course of conduct or common scheme or plan as the offense of conviction," it cannot be included in the calculation of the Base Offense Level.

At trial, the government introduced ten exhibits that were alleged to have contained either a controlled substance or a controlled substance analogue. These exhibits were numbered 25, 36-38, 65-69 and 74. The DEA chemists testified that these exhibits tested positive for either AB-FUBINACA, THJ-2201, XLR-11 or PB-22. They also testified as to the net weights of these exhibits. Their testimony was that the net weight of these exhibits was between 34-40 kilograms.

However, based upon an examination of the net weights listed in the DEA Southeast Laboratory Reports provided to the defendant by the government, the net weight of the exhibits was 9042.2 grams of identified controlled substance or a controlled substance analogue adhered to a leafy material, 18,869.80 grams of loose powder and 538.5 grams of liquid. This provides a combined total of 28,450.5 grams or 28.45 kilograms.

The government was never able to introduce any testimony or evidence about the contents of any shipments received from any Chinese supplier or what was contained in any packages shipped via UPS or FedEx, other than that which was introduced at trial as an exhibit listed above.

At trial the defendant presented the expert testimony of Dr. Daniel Buffington, Barry Funck and Wayne Morris regarding the testing procedures and practices utilized by the DEA Southeast Laboratory, as well as the opinions offered by the government's experts. These same expert witnesses are expected to testify at the sentencing hearings. The summary of their testimony is that the testing procedures and practices utilized by the DEA Southeast Laboratory are unreliable and that the opinion offered by the government to prove that the controlled substance analogue is substantially similar to the chemical structure of a controlled substance is incorrect.

Furthermore, as argued at trial through the testimony of the defendant's experts Barry Funck and Wayne Morris, both the methodology for the collection and sampling of the items seized, as well as the testing procedures the DEA Southeast Laboratory, did not provide anything more than the identification of the substance analyzed. There was therefore insufficient reliable evidence presented as to the net weight of the items seized.

Without abandoning any arguments regarding the testing procedures or practices utilized by the DEA Southeast Laboratory to determine the identity and weight of the items introduced at trial, at best, the aggregate weight of controlled substance or a controlled substance analogue that can be used to calculate the base offense level pursuant to USSG §2D1.1 is between 28.45-40 kilograms.

**<u>Drug equivalency conversion ratio</u>**

It is the defendant's position that the conversion rate pursuant to USSG §2D1.1 comment (n.6) should be no greater than 1:1. This is based upon the argument that the unreferenced controlled substance or controlled substance analogues are most closely related to marijuana. This position is supported by the expert testimony of Dr. Daniel Buffington.

Moreover, this is a position that has been adopted by the government in three cases in this District.  The three specific cases are as follows:

12-80218-CR-Marra - Dylan Harrison and John Shealey,
12-80072-CR-Marra - Joel Lester, and
12-80161-CR- Ryskamp - Michael Bryant

This position was a joint recommendations made by the government and the defendant(s).  While the recommendations in the plea agreements were not binding on Judge Mara or Judge Ryskamp, both Judges adopted the joint recommendations.  In reviewing the plea agreements accepted by the Court in these cases, there is no question that the government agreed to the following:

Joel Lester (DE-31) - Paragraph 11 - "they will jointly recommend that the quantity of controlled substance analogue involved in the offense, for purposes of Section 2D1.1(a)and (c) of the Sentencing Guidelines, is at least ten kilograms but less than twenty kilograms, and the most closely related substance pursuant to Section 2D1.1, Application Note 5 of the Sentencing Guidelines is marijuana."

Michael Bryant (DE-82) - Paragraph 10 - "That pursuant to the drug quantity table contained in Section 2D1.1(c)(11), the base offense level is 16."

Dylan Harrison (DE-128) - Paragraph 7(a) - "That, pursuant to Section 2D1.1(c)(11), the equivalent quantity of controlled substance analogue exceeded 20 kilograms, for a base offense guideline level of 18."

John Shealey (DE-147) - Paragraph 7(a) – "That, pursuant to Section 2D1.1(c)(11), the equivalent quantity of controlled substance analogue exceeded 20 kilograms, for a base offense guideline level of 18."

In 2012 the base offense levels were the following:

Level 16 – 10 kilograms to 20 kilograms of marijuana

Level 18 – 20 kilograms to 40 kilograms of marijuana

Either by specific language, "the most closely related substance pursuant to Section 2D1.1, Application Note 5 of the Sentencing Guidelines is marijuana," (Lester) or by reference to the base offense levels in the Drug Quantity Table, USSG §2D1.1(c) (Bryant, Harrison and Shealey), the government has affirmatively adopted this position in similarly situated cases involving the same unreferenced controlled substance or controlled substance analogues.

The defendant asserts that the government ought to be judicially estopped from asserting a crucially inconsistent position in these proceedings.  The facts of this case satisfy the factors described by the Eleventh Circuit in *Stephens v. Tolbert,* 471 F.3d 1173, 1177 (11th Cir. 2006)): (1) whether a later position asserted by a party was clearly inconsistent with an earlier position; (2) whether a party succeeded in persuading a court to accept an earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled; and (3) whether the party with an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

An arbitrary or otherwise selective failure by the government to accord this defendant the benefit of the same arguments the government has rested on in like cases implicates a violation of due process. *United States v. Dickerson*, 248 F.3d 1036, 1043 (11th Cir.2001) (there may be "Due Process implications of separate prosecutions for the same crime under contradictory theories or inconsistent factual premises").  In addition, selective application of the guidelines in a manner adverse to a defendant who proceeds to trial as opposed to entering a guilty plea likewise raises due process concerns.  *See United States v. Rodriguez*, 959 F.2d 193 (11th Cir. 1992) (reversing application of the guidelines in a manner that infringed on fundamental procedural rights).

As a result of the foregoing, pursuant to USSG §2D1.1(c)(12), the appropriate base offense level should be level 16, "at least 20 KG but less than 40KG of Marihuana."

Therefore, the Base Offense Level should be level 16 and with the addition of the 2 point adjustment contained within USSG §2D1.1(b)(12), the Total Offense Level should be level 18. With a Criminal History Category of I, the advisory sentencing guideline range should be 27-33 months.

Furthermore, even if the 1:167 ratio were adopted by the Court, the indictment does not properly invoke application of the 20-year statutory maximum under 21 U.S.C. §841(b)(1)(C). *See Gozlon-Peretz v. United States*, 498 U.S. 395, 402, 111 S.Ct. 840, 845 (1991) (explaining the limited category of drug offenses that expose defendants to potential 20-year sentence). Instead, the indictment merely asserted as surplusage that it would be reasonable to attribute to the defendant types and quantities of drugs dealt with by others within the scope of reasonable foreseeability to the defendant---not that the defendant had himself conspired to possess a substance that was in fact a Schedule I or II controlled substance. The guideline-based analysis in the indictment did not include the elements necessary to invoke 841(b)(1)(C). Nor did the indictment properly state a dual-object conspiracy by referencing as a secondary object possession of analogues, particularly where there is no separate offense under 841(a) for possession of analogues. The indictment, properly construed, charged merely a conspiracy to possess a controlled substance, exposing the defendant to no more than a 5-year statutory maximum.

### Memorandum

Pursuant to Title 18, United States Code, Section 3553(a), the court shall impose a sentence sufficient, but not greater than necessary, to comply with the purpose set forth in sub-

paragraph (a)(2).  As the Court is well aware, due to the mandatory aspect of subsection (b)(1) being held unconstitutional by *United States v. Booker*, 543 U.S. 220, (2005), Title 18, United States Code, Section 3553 is purely advisory for the court.  This allows the court to use its discretion to deviate from the guidelines if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.

### <u>Title 18, United States Code, Section 3553 Factors</u>

To determine a reasonable sentence the district court considers several factors enumerated in Title 18, United States Code, Section 3553.  These factors are as follows:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed -
> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> **(3)** the kinds of sentences available;
> **(4)** the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission that are in effect on the date the defendant is sentenced;
> **(5)** any pertinent policy statement issued by the Sentencing Commission
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> **(7)** the need to provide restitution to any victims of the offense.

A sentencing judge is forbidden from presuming that a guideline sentence is the correct one.  *United States v. Santoya*, No. 06-Cr-82 (E.D.  Wisc.  July 25, 2007) (citing *Rita v. United*

*States,* 551 U.S. 338, 354 (stating that "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence SHOULD apply")).   Rather, the judge, after determining the guideline range, may decide that the guideline sentence:

> should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless.  *See* Rule 32 (f).  Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure.

*Rita,* 551 U.S. at 351.  See also *Id*. at 367 (Stevens, J. Concurring) ("I trust that those judges who had treated the Guidelines virtually mandatory during the post-*Booker* interregnum will now recognize that the Guidelines are truly advisory").

The Supreme Court has established the authority of this Court to disagree with a guideline as a matter of policy to ensure that the guidelines are truly advisory and constitutional.  Because "the guidelines are now advisory… [a]s a general matter, courts may vary based solely on policy considerations, including disagreement with the Guidelines." *Kimbrough v. United States,* 552 U.S. 85, 101-102 (2007) (internal punctuation omitted) (citing *Rita, id at* 351.

Each of these decisions and indeed, the Eleventh Circuit itself, has stressed that district courts are <u>not</u> to treat the Guidelines as presumptively reasonable.  *United States v. Hunt*, 459 F. 3d 1180 (11th Cir. 2006) (explaining that courts "may determine, on a case-by-case basis the weight to give the Guidelines, so long as that determination is made with reference to the remaining Section 3553(a) factors that the court must also consider in calculating the defendant's

sentence").   In fact, the *Hunt* Court explained that there are "many instances where the Guidelines range will not yield a reasonable sentence." *Id.* at 1184.

In particular, the Eleventh Circuit repeatedly has affirmed below guideline sentences after *Booker.*   See *United States v. Anderson*, 267 Fed. App'x 847 (11th Cir.  2008) (affirming sentence of probation with home-confinement for white collar defendant where Guidelines were 18 to 24 months and prosecutor was requesting 18 month sentence, explaining that under *Gall*, district courts had wide discretion at sentencing); *United States v. Clay*, 483 F. 3d 739 (11th Cir. 2007) (affirming 60 month sentence even though the Guidelines were 188 to 235 months based on post-offense rehabilitation; *United Strates v. Mathis*, 186 Fed. App'x 971 (11th Cir.  2006) (50% percent variance from the top end of Guidelines affirmed in Hobbs Act extortion and obstruction case); *United States v. Gray*, 453 F.3d 1323 (11th Cir.  2006) (affirming 72 month sentence even though low end of Guidelines was 151 months, more than double sentence imposed); *United States v. Halsema*, 180 Fed. App'x 103 (11th Cir.  2006) (unpublished) (affirming 24 month sentence even though Guidelines were 57 to 71 months); *United States v. Williams*, 435 F. 3d 1350 (11th Cir.  2006) (90 months imprisonment was sufficient, but not greater than necessary to punish, deter, and rehabilitate defendant even though low end sentence was 188 months).   Therefore, as *Booker* made clear, the Court must still consider all of the factors set forth in 18 USC § 3553(a), in determining the particular sentence to be imposed.

In addition, this Court may determine that the Sentencing Commission did not develop the applicable guideline using its traditional empirical approach.   Synthetic cannabis analogues in general have not been the subject of federal prosecutions for long enough to create a large body of meaningful historical data.  This guideline is not "the  product  of careful   study   based   on   extensive   empirical   evidence   derived     from  thousands  of

individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 45 (2007).   In *United States v. Adiel Sanchez Brey,* Case Number 15-10165, an unpublished decision filed on September 21, 2015, by the Eleventh Circuit, the Eleventh Circuit stated that "the clear-error standard allows for courts to come to different conclusions as long as the conclusions are supported by substantial evidence in the record." *Adiel Sanchez Brey, id at  p.12, fn 5.*

The Supreme Court has recognized that when the Commission did not develop a guideline based upon empirical data of  past sentencing practices and national sentencing experience, it is not likely the guideline "reflect[s] a rough approximation of sentences that might achieve §3553(a)'s objectives," and that a policy- based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-110; *Spears v. United States,* 555 U.S. at 261, 264 (2009); *Rita*, 551 U.S. at 348, 349-50.

### History and Characteristics of the Defendant

Ronen Nahmani is 41 years old and the father of 5 young children ranging in ages from 2 years to 8 years.  He is the oldest of five children in an observant Jewish family that emigrated from Israel when he was a teenager.  As the oldest son, his family has relied upon him to guide the younger siblings in their assimilation to a new culture, but to remain observant of the traditions of their cultural heritage.

His wife of 13 years, Szilvia Nahmani, has always relied on her husband for the financial support of their family, but now must rely on public assistance, friends, family and the congregants of her synagogue to assist financially during her husband's incarceration.  She noted that her young children are suffering emotionally in their father's absence and do not understand why he cannot come home.  Nahmani has never been away from his children for more than several days.  Although they have visited him at the detention center, they become emotionally distraught when they must part company with him at the end of their visits.

Some of the children have nightmares and are acting out their anger and frustration in inappropriate ways. Their daughter Daniella has been uncharacteristically aggressive, kicking and biting her siblings. Teachers have reported that their son Orel makes comments about wanting to kill himself. Mrs. Nahmani advised a social worker has been coming to their home to work with the children, but there has been little change in their emotional state. She recalled that she attended court every day during her husband's trial and read from her prayer book to find strength to sustain herself and her children through this ordeal. She continues to pray every day that her husband will return home soon.

### Application Note 6 to USSG §2D1.1 Results in a Guideline Range that is Grossly Disproportionate to the Amount of Controlled Substances Involved in the Defendant's Case

Over the years, the Sentencing Commission has recognized specific challenges to measuring the weight of some drugs, which give rise to proportionality issues in sentencing. The Sentencing Guidelines have been amended, as to some controlled substances, to require courts to use the actual weight of the drug as opposed to the traditional method of using the total weight of the mixture which contains the controlled substance. *See* U.S.S.G. § 2D1.1(c) comment n.(A). The main examples in which the  guidelines do not apply the total weight of the mixture or substance include: (i) PCP; (ii) amphetamine; (iii) methamphetamine; (iv) oxycodone; and (v) LSD. *See* U.S.S.G. § 2D1.1(c) comment n.(B).

For example, effective November 1, 1993, the Sentencing Guidelines were amended in an effort to eliminate the disparity for offenses involving the same quantity of lysergic acid diethylamide (LSD) on different carrier mediums. The Sentencing Commission standardized the weight of each dose of LSD as 0.4 milligrams, irrespective of the actual weight of the dose. A uniform standard was necessary because of the difficulty of

calculating LSD weight caused by the differing weights of carrier mediums. The Commission determined that "[b]ecause the weights of LSD carrier media vary widely and typically far exceed the weight of the controlled substance itself, ... basing offense levels on the entire weight of the LSD and carrier medium would produce unwarranted disparity among offenses involving the same quantity of actual LSD (but different carrier weights), as well as sentences disproportionate to those for other, more dangerous controlled substances, such as PCP." 1995 USSG § 2D1.1, comment.  Before the amendment, there was a potential for wide variance in sentences based upon the arbitrary weight of the particular carrier medium involved.

The Sentencing Commission's reasoning for the 1993 amendment applies equally to synthetic cannibinoids.  With synthetic cannibinoids, the carrier media vary and typically far exceed the weight of the controlled substance itself.  Also, the use of THC as "the most closely related controlled substance referenced in [the] guidelines" creates disproportionate sentences due to the guideline ratio to marijuana (167:1).  The reasoning behind the Sentencing Guidelines' THC-Marijuana ratio is based upon the actual ratio of the weight of marijuana, including the plant matter, with the relative weight of pure THC. The controlled substances and analogue controlled substances at issue in this case, AB-FUBINACA, THJ-2201, XLR-11 or PB-22 are in some instances applied to a heavy carrier medium, which in and of itself is not a controlled substance.

For another controlled dangerous substance, the Sentencing Guidelines were amended in 2003 to address the "proportionality issues in the sentencing of oxycodone trafficking offenses."  U.S. Sentencing Manual app. C, vol. II, at 387–88 (2003).

The Sentencing Commission provided the following reason for the 2003 amendment:

This amendment responds to proportionality issues in the sentencing of oxycodone trafficking offenses. Oxycodone is an opium alkaloid found in certain prescription pain relievers such as Percocet and OxyContin. This prescription drug generally is  sold in pill form and, prior to this amendment, the sentencing guidelines established penalties for oxycodone trafficking based on the  entire weight of the pill. The proportionality issues arise (1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight.

As an example of the first issue, the drug Percocet contains,  in addition to oxycodone, the non-prescription pain reliever acetaminophen. The weight of the oxycodone component  accounts for a very small proportion of the total weight of the pill.  In contrast, the weight of the oxycodone accounts for a  substantially greater proportion of  the weight of an OxyContin pill. To  illustrate this difference, a Percocet pill containing five milligrams (mg) of  oxycodone  weighs  approximately  550  mg  with oxycodone accounting for 0.9 percent of the total weight of the pill.  By comparison, the weight of an OxyContin pill containing 10 mg  of oxycodone is approximately 135 mg with  oxycodone  accounting  for  7.4  percent  of  the  total weight. Consequently, prior to this amendment, trafficking 364 Percocet pills or 1,481  OxyContin pills resulted in the same five year sentence of  imprisonment. Additionally, the total amount of the narcotic oxycodone  involved in this example is vastly different depending on the drug. The 364 Percocets produce 1.8 grams of actual oxycodone while the 1,481 OxyContin pills produce 14.8 grams of oxycodone.

The  second  issue  results  from  differences  in  the formulation of OxyContin. Three different amounts of oxycodone (10, 20, and 40 mg) are contained in pills of identical weight (135 mg). As a result, prior to  this amendment,  an  individual trafficking in  a  particular number  of  OxyContin pills would receive the  same sentence regardless of the amount of oxycodone contained in the pills.

To remedy these proportionality issues, the amendment changes  the  Drug  Equivalency  Tables  in  §  2D1.1 (Unlawful  Manufacturing,  Importing,  Exporting,  or Trafficking (Including Possession with Intent to Commit

> These Offenses); Attempt or Conspiracy) to provide sentences for oxycodone offenses using the weight of the actual oxycodone instead of calculating the weight of the entire pill.

U.S. Sentencing Guidelines Manual app. C, vol. II, at 387–88 (2003).

The proportionality issues that exist in synthetic cannibinoid cases could be easily remedied in the same way, by providing sentences based upon the weight of the actual controlled substance or analogue, instead of including the weight of the entire mixture of green leafy substance carrier medium. If actual weights prove too burdensome to calculate or determine, empirical data or averages could be used.

Until the Guidelines are amended to address this issue a downward variance is appropriate. The 2014 amendments do not address this issue directly, but a variance would be consistent with the sentencing goals as stated by the Commission:

> The reduction in drug guidelines that becomes effective [November 1, 2014] represents a significant step toward the goal the Commission has prioritized of reducing federal prison costs and overcrowding without endangering public safety. Commissioners worked together to develop an approach that advances the causes of fairness, justice, fiscal responsibility, and public safety, and I am very pleased that we were able to agree unanimously on this reasonable solution. I am also gratified that Congress permitted this important reform to go forward.

Comment of Honorable Patti B. Saris, Chair, US Sentencing Commission, on amendment reducing drug guidelines.

### Nature and Circumstances of the Offense and
### The Need to Avoid Unwarranted Sentence Disparities

The court shall consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

As explained below, there are at least some cases that have interpreted the

provisions of USSG §2D1.1 and have involved sentences for distribution of synthetic cannabis or controlled dangerous substance analogues, and are similar to Mr. Nahmani's case.  Counsel submits these cases support a non-guideline sentence from whatever range is determined by the Court.

In addition to the three cases in this District involving four defendants discussed at pages 10-11 above, there have been a number of unreported District Court cases that make it possible to compare the guideline range in this case with sentencing decisions in other cases.  This section discusses other cases involving JWH-018 or analogues of JWH-018 and to the extent known, descriptions of the government's and the relevant district court's treatment of these substances.[1]

In many of these cases the court determined that marijuana was the most closely related controlled substance to analogues of JWH-018, instead of THC. Counsel is not at this time attempting to reargue the Court's determination of this issue, but submits these cases to demonstrate that a variance is necessary to avoid unwarranted sentencing disparities for defendants found guilty of similar conduct.

Western District of Oklahoma

*United States v. Saiham Zahid Sadiq*, 12-CR-153. Defendant pled guilty to Distribution of a controlled substance analogue. (Doc. 25). The factual basis statement clarified that it was a "synthetic marijuana" product he was selling and acknowledged selling for a period of 17 months. (Doc. 25, at 11). His sentencing minutes indicate no party

---

[1]  This list of cases was initially compiled by Assistant Federal Public Defender Jason Tupman from the office of the Federal Public Defender for the Districts of North and South Dakota, for use in the case of *United States v. Corey Morrison*, Case No. CR-12-40114 in the Southern Division of the United States District Court of South Dakota.  Mr. Morrison received a  sentence of 34 months.

submitted objections to the PSR. (Doc. 32). Counsel for Mr. Nahmani was advised by counsel for Mr. Sadiq that a 1:1 with marijuana ratio was applied in the PSR. Ultimately, the Defendant received probation. (Doc. 33).

The *Sadiq* case provides particularly compelling support for a variance, because the conduct at issue was so similar, and the geographic region is relatively close. In *Sadiq*, the defendant was selling "synthetic marijuana" from a convenience store in Oklahoma City. The Affidavit in support of the complaint alleges that an undercover agent for the U.S. Department of Homeland Security made a number of purchases of "Mad Hatter" and on at least one occasion 3 grams of "Diablo" brand synthetic cannabis. On May 21, 2012 State and Federal search warrants were executed at the convenience store and 400 packages of synthetic marijuana and in excess of $1,500.00 in U.S. currency were seized. Sadiq admitted to agents that he had been selling synthetic marijuana for approximately a year and a half. (A copy of the Complaint and Affidavit in *Sadiq* are attached hereto as Exhibit "A").

The Defendant was subsequently indicted and pled guilty to one count of possession and distribution of synthetic marijuana in violation of 21 U.S.C. §813 and 21 U.S.C. §841(a)(1), and was sentenced to 60 months of probation. (Copies of the Indictment and Judgment in the *Sadiq* case are attached hereto as Exhibits "B" and "C" respectively).

<u>Eastern District of Kentucky</u>

*United States v. Nawaz Khan*, 12 CR 00102. Defendant pled guilty to Count 1 of the Third Superseding Indictment alleging distribution of AM-2201. (Doc. 328). The factual basis in the plea agreement acknowledges distribution of "$100,000 worth" of synthetic marijuana product and converted the cash value to 49.9995 kilograms of "marijuana

equivalency." (Doc. 328). The conversion rate as detailed in the factual basis statement was clearly utilizing a 1:1 equivalency with marijuana. The government and defendant stipulated that "Pursuant to U.S.S.G.

§ 2D1.1(c)(10) and Application Notes 6 and 8, the base offense level is 20 based on the marijuana equivalency for the agreed upon amounts." (Doc. 328 at p.6). Defendant ultimately received either a downward variance or downward departure to probation. (Doc. 395).

United States v. Victor Manuel Colindres-Hernandez, 12-CR-00102. Defendant pled guilty to Count 1 of the Fourth Superseding Indictment alleging distribution of an analogue to JWH-018. The factual basis statement provided that the government believed "that Hernandez conspired with others to distribute at least 100 but less than 400 kilograms" of synthetic marijuana containing AM-2201 and other JWH-018 analogues. (Doc. 301 at p. 6.). The government and defendant further recited that "pursuant to U.S.S.G. § 2D1.1(c)(7), believes the base offense level if [sic] 26." (Doc. 301 at p. 7). Putting those two facts together, it is clear that an equivalency of 1:1 with marijuana was utilized. The defendant ultimately must have received a downward departure or variance and was sentenced to 24 months. (Doc. 423).

United States v. Zafar Iqbal Nasir, 12-CR-00102. Defendant pled guilty to the Fourth Superseding Indictment alleging distribution of an analogue of JWH-018. The Factual basis statement indicated "Nasir admits that he conspired with others to distribute 700-1,000 kilograms of synthetic canabinoids and analogues of synthetic cannabinoids, including the Happy Tiger brand containing" an analogue of JWH-018. The government and defendant stipulated that "Pursuant to U.S.S.G. § 2D1.1(c)(5), the base offense level is

30." (Doc. 340 at p. 6).  Again, the weight admitted and stipulation indicate an equivalency of 1:1 with marijuana.  Ultimately, the defendant must have received a variance and/or departure and was sentenced to 50 months. (Doc. 353).

*United States v. Asim Malik*, 12 CR 00102.   Defendants' plea agreement is identical to Nawaz Khan's. (Doc. 332).  Defendant ultimately received a downward departure to probation. (Doc. 396).

*United States v. Joshua Logan Fox*, 12 CR 00102.   Defendant pled guilty to distributing an analogue of JWH-018.  The plea agreement contains a statement "that for the Happy Tiger and Black Magic brands of synthetic marijuana distributed by Fox on March 14, 2012, and June 19, 2012, and the Happy Tiger synthetic marijuana sold by Fox to Muhammed, the marijuana equivalency is at least 10 kilograms but less than 20 kilograms of marijuana. (3,532 packets x 3.5 grams per packet (average) = 12,362 grams)."  (Doc. 323 at p. 4).  It is clear from this stipulation that the equivalency of the synthetic marijuana product was 1:1 with marijuana.  The agreement also contained a stipulation that defendant will not seek a "decrease in the offense level based  on a mitigating role." (Doc. 323 at p. 5). Defendant received a departure or variance to  probation. (Doc. 413).

<u>Middle District of Florida</u>

*United States v. Ilan Fedida*, 12-CR-00209. Defendant pled guilty to distributing a controlled substance analogue of JWH-018. (Doc. 128).   The factual basis statement indicated the defendant was caught with over $100,000 in proceeds from distributing synthetic cannabinoids. (Doc. 128).  Also, seized were JWH-018, damiana leaf, and sprayers to apply  the substance to the damiana leaf. (Doc. 128).  It is not publicly stated  what  the defendant's guideline  range was,  however,  with  $100,000  dollars  worth  of  proceeds

admitted, if the 1:167 ratio was utilized Fedida would have received a very large departure or variance because the defendant ultimately received probation. (Doc. 133).

These cases demonstrate that a sentence for Mr. Nahmani within or near the guideline range as currently calculated in the PSIR would be disproportionately severe and far harsher than the sentences imposed against a number of defendants convicted of similar conduct.   The need to avoid unwarranted sentencing disparities should receive considerable weight in the  sentencing determination, and supports a significant downward variance for Mr. Nahmani.

### Promotion of Respect for the Law, Just Punishment for the Offense, Adequate Deterrence to Criminal Conduct and Protection of the Public from Further Crimes of the Defendant

The Court must fashion a sentence that is sufficient, but not greater than necessary, to reflect the seriousness of the offense, to promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant.

The crime of conviction in this instant cause is not a crime of violence, nor was there any evidence of violence presented during the course of the trial.  The defendant has no prior record of conviction and has otherwise shown respect for the law.  A sentence of incarceration of less than 10 years would reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from further crimes of the defendant and would be consistent with the current policies of the Department of Justice.

### Types of Sentences Available, the Sentencing Range as Set Forth in the Sentencing Guidelines, as well as Any Pertinent Policy Statement Issued By the Sentencing Commission

The Court might also consider the comments of Chief Judge Pattie B. Saris, Chair of the United States Sentencing Commission, when she testified at a public meeting of the Charles Colson Task Force on Federal Corrections, established to address the crisis facing federal

corrections.[2]  She noted that the size of the federal prison population is a serious problem, insofar as in 2014, the size of the Bureau of Prisons' population exceeded their capacity by 32 percent and by 52 percent in high security facilities.  Meanwhile, the nation's budget concerns persist, while the prison system consumes nearly $7 billion annually in federal revenues.  The task force has acknowledged that the sentencing courts are the "front line" in decision making relative to balancing prison overcapacity with the safety of the community.  In each case before the Court, it is important to examine the relative risk to the community based upon the crimes and personal characteristics of a particular defendant.

There is strong bipartisan U. S. Congressional support for sweeping reforms to Federal sentencing laws and Sentencing Guidelines, particularly as they relate to drug offenses.  A bipartisan bill has been sponsored in the U. S. Senate, <u>The Sentencing Reform and Corrections Act of 2015</u>, which proposes reductions in statutory sentences for non-violent crimes, including drug offenses.  A bipartisan bill has been sponsored in the U.S. House of Representatives, <u>Safe Justice Act of 2015,</u> which provides for mandatory sentence reductions, increases in gain time credits and other incentives for rehabilitation and early release from prison.

Understandably, the focus for reducing the federal prison population has been on non-violent drug offenses similar to the instant offense. According to the most recent report from the Bureau of Prisons, as of August 2015, over 48% of federal inmates (94,134) are incarcerated for drug offenses.  With a cost to taxpayers of $30,000 per year per inmate, these inmates account for $2.8 billion in annual federal spending.  Both Congress and the Sentencing Commission recognize that this level of spending for incarceration is unsustainable and reforms to the current system are under consideration at all levels of the federal government.

---

[2]  See Testimony of Chief Judge Patty B. Saris, Chair, U.S. Sentencing Commission, for the Public Meeting of the Charles Colson Task Force on Federal Corrections, @ USSC.gov

In fashioning an appropriate sentence, the Court is evaluated for the reasonable use of its discretion. The sentence recommended in the PSR is far greater than necessary to comply with the purposes set forth in 18 U.S.C. 3553(a)(2). The defendant is a first time, non-violent offender convicted of a drug crime for which the drug conversion application under the sentencing guidelines is seriously flawed. He is the sole supporter of a large family that has been devastated by his incarceration, and is in need of his love, guidance and support. His incarceration for the statutory maximum term of imprisonment of 20 years would impose an unnecessary financial burden on the taxpayers of over $600,000. It is this very circumstance that has generated unprecedented bipartisan Congressional support for sweeping reforms to statutory and guideline penalties. Sadly, Mr. Nahmani may not be eligible to receive the benefit of these future reforms, but the Court has within its discretion to consider these factors and impose a sentence that reflects the changing legislative priorities and intent that will surely culminate in future reductions to statutory and guideline penalties.

**Conclusion**

Apart from the raw numbers that result from the application of the advisory sentencing guidelines, the Court can use its discretion to fashion a total sentence that would adequately take into account the factors set forth in Title 18, United States Code, Section 3553.

It is respectfully submitted that after analyzing all of the factors presented to the Court, a sentence of less than 10 years would be the proper sentence for Mr. Nahmani. This sentence would be both an appropriate and sufficient sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct and would protect the public.

Respectfully submitted,
/s/  David S. Weinstein
David S. Weinstein, Esq.
Florida Bar No. 749214
Clarke Silverglate, P.A.
799 Brickell Plaza, Suite 900
Miami, Florida 33131
Telephone:  (305) 377-0700
Facsimile:  (305) 377-3001
Email: Dweinstein@cspalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2015, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF

/s/  David S. Weinstein
David S. Weinstein, Esq.